Terrell J. **WOODLEY**, Plaintiff,

v.

Michael J. **ASTRUE**, Commissioner of Social Security, Defendant.

Civil Action No. 6:07–0985–SB.

United States District Court,
D. South Carolina,
Greenville Division.

July 25, 2008.

Beatrice E. Whitten, Beatrice E. Whitten Law Office, Mt Pleasant, SC, for Plaintiff.

## ORDER

SOL BLATT, JR., Senior District Judge.

This is an action brought pursuant to Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's ("Commissioner") final decision, which denied Terrell J. Woodley's claim for Supplemental Security Income ("SSI") benefits. The record includes a Report and Recommendation ("R & R") of a United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b) (1)(B) and Local Rule 73.02(B)(2)(a). In the R & R, Magistrate Judge William M. Catoe recommends that the Court affirm the Commissioner's final decision. The Plaintiff filed timely objections to the R & R, and the Defendant filed a response to the Plaintiff's objections. *See* 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to a Magistrate Judge's R & R within ten days after being served with a copy).

## BACKGROUND

### I. Procedural History

The Plaintiff was born on June 19, 1979. On January 14, 1993, he filed for SSI benefits due to attention deficit hyperactivity disorder ("ADHD") and was awarded these benefits beginning on January 1, 1993. The Plaintiff completed the ninth grade and has no past relevant work experience.

When the Plaintiff turned eighteen years old on June 19, 1997, his claim was reevaluated, and it was determined that his condition had improved and that he no longer had marked and/or severe functional limitations. Disability was determined to have ceased on August 1, 1997, and eligibility for benefits was terminated at the end of October of 1997.

The Plaintiff's mother filed a motion for reconsideration, which was denied by a disability hearing officer on June 14, 1999. The Plaintiff's mother then filed a timely request for a hearing, and on February 10, 2000, a hearing was held before Administrative Law Judge ("ALJ") J.L. Barroll. The Plaintiff and his mother attended the hearing. Following the hearing, ALJ Barroll issued a denial decision, finding that the Plaintiff could perform medium work that did not involve continuous use of the left hand. The Plaintiff requested review of the decision, and on December 6, 2001, the Appeals Council remanded the case to the ALJ for further consideration.

On March 13, 2002, ALJ R. Alexander Hild held a supplemental hearing, at which the Plaintiff, his attorney, his mother, and a Vocational Expert ("VE") appeared. On January 13, 2003, ALJ Hild, like ALJ Barroll, found that the Plaintiff's disability had ceased on August 1, 1997. ALJ Hild's finding became the final decision of the Commissioner of Social Security when the Appeals Council approved it on July 10, 2004.

Thereafter, the Plaintiff filed suit in the district court seeking judicial review of the Commissioner's final decision. On January 9, 2006, Magistrate Judge Catoe issued an R & R recommending that the Court reverse the Commissioner's final decision under sentence four of 42 U.S.C. § 405(g) and remand the matter for further consid-

eration. Because neither party filed objections to the R & R, the Court adopted the R & R as the order of the Court on February 2, 2006.

Following remand, ALJ Hild held another hearing on January 24, 2007, at which the Plaintiff's mother, his attorney, and VE Arthur F. Schmitt, Ph.D. appeared.[1] On February 16, 2007, ALJ Hild again found that the Plaintiff was not under a disability. The ALJ's decision became the final decision of the Commissioner when the Appeals Council approved it. The Commissioner adopted the following findings of the ALJ:

(1) The claimant has not engaged in substantial gainful activity since January 1, 1993, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

(2) The claimant has the following severe impairments: borderline intellectual functioning, antisocial traits, loss of grip strength in the left hand due to flexion contracture, and chronic back pain (20 CFR 416.920(c)).

(3) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(4) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work. He can lift up to 50 pounds occasionally and 25 pound frequently. He reads at the fourth grade level and is illiterate. He has a Verbal IQ of 73, a Performance IQ of 73, and a Full Scale IQ of 72. He is right-handed. He has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip (with grip strength 3/5 on the left). He has antisocial personality traits resulting in moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods. He is limited to working in a relatively low stress setting where he would not have to deal with the general public or relate extensively with others.

(5) The claimant has no past relevant work (20 CFR 416.965).

(6) The claimant was born on June 19, 1979 and he is now 27 years of age, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963).

(7) The claimant is illiterate and is able to communicate in English (20 CFR 416.964).

(8) Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

(9) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

(Tr. at 386–91.)

On April 11, 2007, the Plaintiff filed the present suit in this Court, seeking review

---

**1.** There is some discrepancy over whether the Plaintiff appeared at this hearing. According to ALJ Hild's denial decision, the Plaintiff was not present at this hearing, but according to the 2008 R & R, the Plaintiff was present at the hearing.

of the Commissioner's final decision and asserting that the ALJ: (1) did not obtain VE testimony as ordered by prior remand; (2) failed to properly evaluate and consider lay testimony as ordered by prior remand; and (3) failed to consider whether the Plaintiff's combined impairments were of equal medical significance to a listed impairment.

## II. Medical Evidence

The Plaintiff was 27 years old on the date of the Commissioner's final decision. He completed the eighth or ninth grade in special education classes and has no past relevant work experience.

According to the record, on August 12, 1997, Cashton B. Spivey, Ph.D evaluated the Plaintiff at the request of the Commissioner. Dr. Spivey noted that the Plaintiff had never been hospitalized for any physical or mental problem and had been taking Ritalin for ADHD, although he had not taken Ritalin on the day of the evaluation. The Plaintiff complained of problems with attention and concentration, denied symptoms of depression or psychosis, and reported normal sleep and energy levels. The Plaintiff also claimed that he could read a newspaper and perform simple arithmetic calculations. Dr. Spivey found that the Plaintiff read and performed arithmetic at a fifth-grade level; he also found that the Plaintiff had borderline intellectual functioning with a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72. Dr. Spivey noted that the Plaintiff displayed no weakness in immediate visual memory, which Dr. Spivey found to be inconsistent with ADHD. Dr. Spivey concluded that the Plaintiff was developing antisocial personality traits, would continue to benefit from special education classes, and hopefully would be able to join the work force in the future. Dr. Spivey also concluded that the Plaintiff was better suited for manual labor tasks than verbal or arithmetic tasks.

On August 18, 1997, Dr. John Aycock examined the Plaintiff at the request of the Commissioner. Dr. Aycock found that the Plaintiff had a flexion-tendon injury of the ring finger of the left hand, which could be corrected surgically, and no other physical abnormalities.

On August 21, 1997, at the request of the Commissioner, Dr. Herbert Gorod completed a Psychiatric Review Technique Form regarding the Plaintiff based on a review of the Plaintiff's records. Dr. Gorod found that the Plaintiff's borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living, social functioning, and concentration, and had "once or twice" resulted in episodes of decompensation in work-like settings. In an accompanying mental residual functional capacity assessment, Dr. Gorod reported that the Plaintiff had no significant limitations in most areas of work-related mental functioning and "moderate" limitations in understanding, remembering, carrying outdetailed instructions, accepting instructions, and responding appropriately to criticism from supervisors.

On February 25, 1999, Dr. James W. Folk, Jr. examined the Plaintiff at the request of the Commissioner. The Plaintiff complained of two physical ailments: (1) back pain resulting from an injury received in September 1998, when a truck struck him, and (2) an inability to extend his left ring finger. The Plaintiff denied receiving any psychiatric treatment; he also denied taking any medication except for occasional doses of Motrin and Ritalin to calm him. He claimed that he occupied his time by exercising, walking around, playing basketball, and doing some occasional chores and yard work. The Plaintiff reported that he recently completed a

GED program but had not yet taken the test due to lack of funds. The Plaintiff's mother indicated that he "[ran] with a bad crowd," engaged in various antisocial behaviors, and had difficulty with various tasks due to a failure to pay attention.

Dr. Folk concluded that the Plaintiff had fair memory and limited general information; below-average counting, calculating, and digit-recall abilities; absent insight; moderately-impaired judgment; and low-average intellectual functioning. Dr. Folk determined that the Plaintiff was capable of interacting socially as well as concentrating, understanding, and responding appropriately. Additionally, Dr. Folk noted that the Plaintiff denied many of the behaviors described by his mother. Dr. Folk reported the previous diagnoses of ADHD, antisocial personality traits, and a GAF of 65.[2] Noting the Plaintiff's history of ADHD and the concern regarding the Plaintiff's personality deficits and "his need for some structure in his life," Dr. Folk determined that the Plaintiff "would be quite capable of doing some type of manual labor." Thus, Dr. Folk recommended referral to the Department of Vocational Rehabilitation.

On March 16, 1999, at the request of the Commissioner, Lisa Smith–Klohn, Ph.D., completed a PRTF regarding the Plaintiff based on a review of his records. Dr. SmithKlohn reported that the Plaintiff's ADHD, borderline intellectual functioning, and antisocial personality disorder caused "moderate" limitations in activities of daily living and social functioning, "often" caused deficiencies of concentration, and "never" resulted in episodes of deterioration or decompensation in work-like settings. In an accompanying mental residual functional capacity assessment, Dr. Smith–Klohn reported that the Plaintiff had no significant limitations in most areas of work-related mental functioning and moderate limitations in understanding, remembering, and carrying out detailed instructions, and in maintaining concentration and attention for extended periods.

On April 29, 1999, also at the request of the Commissioner, Dr. Richard Weymuth assessed the Plaintiff's physical residual functional capacity based on a review of his records. Dr. Weymuth determined that the Plaintiff did not have a "severe"[3] physical impairment.

On December 20, 1999, an orthopedist at the Medical University of South Carolina found that the Plaintiff had decreased grip strength in the left hand and problems with flexion and contraction in the fingers of the left hand, particularly the ring finger, due to a previous injury.

On March 14, 2000, Dr. Craig Harris examined the Plaintiff due to complaints of injuries sustained in a motor vehicle accident that had occurred a week earlier. The Plaintiff complained of headaches, dizziness, insomnia, neck pain, upper back pain, mid-back pain, low-back pain, and left hand and wrist pain. Dr. Harris found that the Plaintiff had normal strength in the upper and lower extremities, decreased range of motion of the lumbar spine, muscle spasms in the cervical re-

---

**2.** A Global Assessment of Functioning ("GAF") code between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal rela- tionships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994).

**3.** An impairment is "severe" if it significantly limits a claimants physical or mental ability to do basic work activities. *See* C.F.R. § 416.921(a) (2007).

gion, and decreased grip strength in the left hand. He noted an assessment of cervicogenic cephalgia, cervical strain/sprain, thoracic strain/sprain, lumbar strain/sprain, and exacerbation of preexisting hand injury. Dr. Harris recommended medication for inflammation and pain. On a later visit to Dr. Harris, Woodley complained of severe low-back and left hand pain; however, his neurological exam was unremarkable, and Dr. Harris recommended continued conservative treatment and an MRI scan.

On October 14, 2001, the Plaintiff went to Care Alliance Health Services complaining of headaches, pain in the right knee, and mid-back pain following a motor vehicle accident. An impression of contusion of the right knee and back strain was rendered.

On January 10, 2002, the Plaintiff again visited Care Alliance Health Services complaining of back pain since October 2001. The Plaintiff reported that he had not taken any medication to attempt to relieve his pain, and his examination was unremarkable. He was diagnosed with chronic low-back pain.

In June of 2002, the Plaintiff sought emergency room treatment for complaints of low-back pain. Examination revealed decreased range of motion and muscle spasms in the lower back. Anaprox and Norflex were prescribed for chronic low-back pain.

In October of 2004, the Plaintiff sought emergency room treatment for complaints of dizziness, headache, and nausea. A CT scan of his head was normal. Compazine was administered and a diagnosis of acute cephalgia was noted.

In November of 2005, the Plaintiff sought emergency room treatment for complaints of head and back pain after a fall. On admission, "Jim Grant Carpeting" was identified as his employer. A CT scan of the Plaintiff's head was normal, and x-rays of his back showed a mild compression deformity at T7–8. Percocet was prescribed.

In March of 2006, the Plaintiff sought emergency room treatment for complaints of intermittent headaches after he fell and hit his head several months before. On admission, "Jim Grant Carpeting" was identified as Woodley's employer. Examination was unremarkable except for elevated blood pressure. A CT scan of his brain was normal. He was diagnosed with chronic headaches and hypertension. Lortab or antihypertensive medication were prescribed.

## III. Administrative Hearings

At the hearing on February 10, 2000, the Plaintiff testified that he left school in the tenth grade and attempted to work at a pizza shop as a dishwasher, but the job ended after one day because his hand hurt. The Plaintiff testified that his left hand was weak and started "jumping" for no reason. He further testified that he experienced pain in his right leg while walking. The Plaintiff also testified that he could read "a little bit" and could write.

At the March 13, 2002 hearing, the Plaintiff testified that he enrolled in a GED class but never completed it. He testified that he was unable to grip anything with his left hand and that he experienced intermittent back pain, mostly at night. He further testified that he did "not really" know how to read.

Also, the Plaintiffs mother testified that the Plaintiff did not complete household chores that he started, could not understand cooking instructions, and could not successfully buy items on a shopping list. She testified that his only activities were watching television and listening to the radio. Additionally, she testified that he

was impatient and quick to become angry, and that aspirin was his only medication because he no longer took Ritalin.

Also at the March 13, 2002 hearing, the ALJ asked Vocational Expert Mark Meadows, Ed.D. to consider a person of the Plaintiff's age and educational background who read at a fourth-grade level, was illiterate "in terms of Social Security rules," could perform "medium work," had a full scale IQ of 72, had a flexion-contraction problem with his left ring finger, and had a moderate limited grip strength in his left hand. In response, Dr. Meadows testified that such a person could work as a flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper. He also testified that if the same individual were restricted to low-stress work, he could perform those jobs.

Following the first remand, at the January 24, 2007 hearing, the Plaintiff did not testify but his mother did. The Plaintiff's mother testified that the Plaintiff's back constantly bothered him since he was hit by a truck when he was seventeen years old.[4] Additionally, she testified that he had headaches associated with high blood pressure, for which he took medication. She further testified that he continued to have problems controlling his anger, but that his control of his anger had improved. She testified that he was forgetful and needed to be reminded to finish tasks. Also, she testified that the Plaintiff pushed her around in her wheelchair, gave her medications, watched television (mainly cartoons), spent time with her granddaughter, and performed housework if she constantly told him what to do. Finally, she testified that the Plaintiff's current main problem was back pain.

Also at the January 24, 2007 hearing, the ALJ asked Vocational Expert Arthur F. Schmitt, Ph.D., to consider a person with the following limitations:

Assume I find the claimant is 27–years of age and has an 8th grade education in special education and is illiterate by Social Security standards. Assume further for the moment that on an exertional level he could perform no greater then [sic] medium work activity and that he has the following non-exertional limitations. He's, he reads at the 4th grade level and is illiterate by our standards, he has a verbal IQ of 73, a performance IQ of 73 and a full scale IQ of 72. He's right-handed, he has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip. The grip strength in his left hand is three out of five. In addition he has a[sic] antisocial personality resulting in moderate limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and ... attention ... for extended periods. He's limited to working at a relatively low-stress setting where he couldn't have to deal with the general public or relate extensively with others.

(Tr. 513–14.) Considering these limitations, Dr. Schmitt testified that such a person could perform unskilled medium work as a laundry worker and unskilled light work as a carton packer. Dr. Schmitt acknowledged that a person with the limitations described in the ALJ's hypothetical would be limited to jobs re-

---

**4.** It is not entirely clear from the record when the Plaintiff was hit by the truck. The R & R states that the Plaintiff was struck in 2002, at which time the Plaintiff would have been twenty-two or twenty-three years old. However, the Plaintiff's mother testified that the Plaintiff was struck when he was seventeen years old. Finally, Dr. Folk noted that the Plaintiff complained of back pain resulting from being struck by a truck in September 1998, at which time the Plaintiff was nineteen years old.

quiring level-one reasoning, but that the jobs of laundry worker and carton packer were described in the *Dictionary of Occupational Titles ("DOT")* as requiring level-two reasoning. In recognizing this apparent conflict, Dr. Schmitt testified that based on his experience, all carton packer jobs and 30 percent of laundry worker jobs required only level one reasoning.

### STANDARD OF REVIEW

### I.   The Magistrate Judge's R & R

■ The Magistrate Judge makes only a recommendation to the Court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the Court. *Mathews v. Weber,* 423 U.S. 261, 269, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The Court reviews *de novo* those portions of the R & R to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

### II.   Judicial Review of a Final Decision

■ The role of the federal judiciary in the administrative scheme as established by the Social Security Act is a limited one. Section 205(g) of the Act provides that, "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive ...." 42 U.S.C. § 405(g). "Consequently, judicial review ... of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart,* 296 F.3d 287, 290 (4th Cir.2002). "Substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particu-

lar conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir.1984) (quoting *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966)). In assessing whether there is substantial evidence, the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency. *Mastro v. Apfel,* 270 F.3d 171, 176 (4th Cir.2001) (alteration in original).

### DISCUSSION

### I.   The Commissioner's Final Decision

The Commissioner is charged with determining the existence of a disability. The Social Security Act, 42 U.S.C. §§ 301–1399, defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ...." 42 U.S.C. § 423(d)(1)(A). This determination involves the following five-step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Ap-

pendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.1. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work.

*Mastro,* 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the next step. *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir.1993). The burden of production and proof remains with the claimant through the fourth step. However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that the claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience. *Walls,* 296 F.3d at 290.

Here, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, January 1, 1993. At the second step, the ALJ found that the Plaintiff established that he had "severe" impairments (listed as borderline intellectual functioning, antisocial traits, loss of grip strength in the left hand due to flexion contracture, and chronic back pain). Third, the ALJ found that these medically determinable impairments did not meet or medically equal any of the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). The ALJ then determined that the Plaintiff's allegations and testimony regarding his limitations were not totally credible and found that the Plaintiff retained the residual functional capacity ("RFC") to perform medium work with the limitation of "working in a relatively low stress setting where he would not have to deal with the general public or relate extensively with others." Because the ALJ found that the Plaintiff had no past relevant work, the analysis proceeded to step five. At step five, the ALJ accepted the VE's testimony that a person of the Plaintiff's age with his educational background and RFC could successfully adjust to other work, and that such jobs exist in significant numbers in the national economy. Therefore, the ALJ found that the Plaintiff was not under a "disability" as defined in the Social Security Act.

## II. The Court's Analysis

As previously noted, on February 2, 2006, this Court adopted the Magistrate Judge's previous R & R and remanded this matter to the Commissioner to conduct a supplemental hearing. The Court directed the ALJ to: (1) include in the hypothetical to the VE the Plaintiff's antisocial personality traits and his moderate limitations in understanding, remembering, and carrying detailed instructions and in maintaining concentration for extended periods; (2) obtain testimony from a VE to explain why the Plaintiff would be able to perform the positions listed by the VE in the 2002 hearing, which required a reasoning level of R–2 or above, when the ALJ had found that the Plaintiff was illiterate and capable of only one- and two-step processes, which under the criteria of the DOT constitutes an R–1 reasoning level; and (3) consider and expressly evaluate the testimony of the Plaintiff's mother and set forth the reasons for not crediting her testimony. On January 24, 2007, a hearing was held at which the Plaintiff, his attorney, his mother, and a VE appeared. On February 16,

2007, the ALJ once again determined that the Plaintiff was not disabled.

In his complaint, the Plaintiff alleges that the ALJ erred when he: (1) did not obtain VE testimony as ordered by prior remand; (2) failed to properly evaluate and consider his mother's testimony as ordered by prior remand; and (3) failed to consider whether the Plaintiffs combined impairments were of equal medical significance to a listed impairment.

After a review of the record, the Magistrate Judge issued an R & R, dated April 2, 2008, wherein he addressed each of the Plaintiff's allegations in turn. First, with respect to the Plaintiff's claim that the ALJ did not obtain VE testimony as ordered on prior remand, the Magistrate Judge noted that the VE's testimony at the January 2007 hearing was "quite confusing" but found that the VE clarified his testimony at the conclusion of the hearing by stating that although the DOT listed the jobs of carton packer and laundry worker as jobs requiring level two reasoning, in his experience, the job of carton packer and 30 percent of the laundry worker jobs require only level one reasoning, of which the Plaintiff was capable. Next, with respect to the Plaintiff's claim that the ALJ failed to properly evaluate and consider his mother's testimony, the Magistrate Judge noted that the ALJ recounted the Plaintiff's mother's testimony in his decision, and it appeared that the ALJ considered the Plaintiff's mother's testimony in making his findings, specifically with respect to the Plaintiff's social functioning and concentration. Lastly, with respect to the Plaintiff's claim that the ALJ failed to consider whether the Plaintiff's combined impairments were of equal medical significance to a listed impairment, the Magistrate Judge reviewed the record and determined that the ALJ properly

considered the combined effect of the Plaintiff's impairments.

In the Plaintiff's written objections to the R & R, he first argues that both the ALJ and the Magistrate Judge failed to reconcile the VE's contradictory testimony. Second, the Plaintiff asserts that the Magistrate Judge erred in finding that the ALJ properly evaluated the Plaintiff's mother's testimony, as the ALJ had been instructed to do on the previous remand. Finally, the Plaintiff asserts that the Magistrate Judge incorrectly dismissed the ALJ's failure to do a proper combination of impairments analysis.

## A. Contradictory Testimony

At the January 2007 hearing, the ALJ set forth the following hypothetical for the VE to consider:

Assume I find the claimant is 27–years of age and has an 8th grade education in special education and is illiterate by Social Security standards. Assume further for the moment that on an exertional level he could perform no greater then [sic] medium work activity and that he has the following non-exertional limitations. He's, he reads at the 4th grade level and is illiterate by our standards, he has a verbal 1Q of 73, a performance IQ of 73 and a full scale IQ of 72. He's right-handed, he has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip. The grip strength in his left hand is three out of five. In addition he has a [sic] antisocial personality resulting in moderate limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and ... attention ... for extended periods. He's limited to working at a relatively low-stress setting where he couldn't have to deal with the

general public or relate extensively with others.

(Tr. at 513–14.) Upon consideration, the VE testified that such an individual could perform the jobs of laundry worker and carton packer, both of which require level 2 reasoning. Because the hypothetical limited the Plaintiff to level one reasoning, the Plaintiff's attorney asked for an explanation of level two reasoning. The VE responded: "the reasoning at 2 means, that they have to make some decisions. Now in the case of the carton packer, there's no decision to be made, they just watch the machine, it packs cigarettes, packs packs ... there's really no heavy level of reasoning involved." (Tr. at 516.) The Plaintiff's attorney then asked the VE the following questions:

Q. Are there—can you name any jobs with the limitations set out in this hypothetical that would be listed as an R1 in the DOT?

A. Probably not in the DOT.

Q. If you added to that hypothetical that the antisocial personality traits included suspicion, displays of anger and difficulty in, of course, he included that difficulty, that [he] not [have] contact with other people. But difficulty in getting along with other people including supervisors, would that [a]ffect his ability to do those jobs?

A. If, if it included not getting along with supervisors it would eliminate the jobs.

Q. Okay, And how about—what's the definition of a moderate limitation? Because it's given as a moderate limitation in understanding, remembering and carry[ing] out detailed instructions. Is there a percentage, you know, it would be 20 percent—

A. Yeah, more, more than 50 percent.

Q. More than 50 percent. So a person who was unable to concentrate, remember and carry out instructions for more than 50 percent of the time could do this work?

A. The carton packer they could do because there's no—

Q. Wouldn't the person need at least to have to concentrate on the machine—

A. Yes.

Q.—and whether the machine was operating?

A. Would have to concentrate on the machine.

Q. And they could do that for only 50 percent of the time?

A. Okay. If he cannot, if he cannot concentrate then I would eliminate it. Could not concentrate more than 50 percent, moderate limitation, i would eliminate the job.

Q. Okay. Would that eliminate pretty much all jobs?

A. Yeah.

(Tr. at 517–18.) Subsequently, the ALJ asked the VE the following questions:

Q. So in my original hypothetical, I never limited him to R1 or R2.

A. Right.

Q. The DOT says this [the laundry worker job] is R2. With the limitations I gave could he do a job in a R2?

A. In a what?

Q. At the R2 reasoning level?

A. He could not according to the DOT.

Q. No. Well, just—all right. So he couldn't do the job as a laundry worker?

A. As it's described in the DOT.

Q. Okay. So there's a conflict between your testimony—

A. That's correct.

Q. —and the DOT? Now the jobs you gave, are they at the R2 level or what are they?

A. They are both at R2 according to the DOT. I'm, I'm basing my testimony on the observation in the factory.

Q. Okay. The 2,618 jobs, are they at R2?

A. That's what the DOT claims, but the few places that I've observed where laundry workers are, they don't have to do—make any reasoning.

Q. Okay. But how many of those jobs are there?

A According to the South Carolina's Department of Labor they're saying there's 2,618 at R2.

Q. How many at R1?

A. I'd cut it by 70 percent.

Q. Okay. The original limitations I gave you, based on your observations and expertise, you know, limiting the work in a relatively, to a relatively low stress setting. Moderate limitations in understanding, remembering and carrying out detailed instructions and maintaining concentration, attention for extended periods, together with his IQ, et cetera. Would those limitations limit him to R1 or R2 or R anything?

A. It would limit him at R2.

Q. So he could only do R1's?

A. Which I've cut that number by 70 percent.

Q. Okay. Now I'll look up carton packer.

A. That's just a machine tender, but I think it's listed as carton packer.

Q. Okay. We have—all right, carton packaging—machine operator, which is the same DOT number you gave me. Okay, strength, light, that is also R2, and the number of jobs in South Carolina you gave me are 3,055. Would I cut that number by 70 percent or—

A. I wouldn't cut them at all because the, the two factories that I observed there's no reasoning involved at all. It would be an R1, I don't know why the DOT has it as an, even at an R2.

(Tr. at 520–21.)

In the R & R, the Magistrate Judge recognized that the VE's testimony was quite confusing but concluded that the ALJ sufficiently reconciled the apparent discrepancies in the testimony. In his objections to the R & R, the Plaintiff asserts that the Magistrate Judge failed to consider the VE's definition of "moderate" as applied to the Plaintiff. After an extensive review of the record including the hearing transcript, the Court agrees.

█ Here, as the Plaintiff points out, the VE testified that a "moderate" limitation is one that is present more than 50% of the time. Here, the hypothetical presented to the VE included a claimant with *"moderate* limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and … attention … for extended periods." When asked whether an individual with moderate limitations in concentration could perform the job of carton packer, the VE specifically testified that he would eliminate the job. Furthermore, when asked whether this "moderate" limitation would eliminate all jobs, the VE testified, "Yeah." (Tr. at 518.) Despite this testimony, the VE also testified that

the Plaintiff could perform the jobs of laundry worker and carton packer. After a thorough review of the VE's testimony, the Court simply cannot reconcile the apparent inconsistencies contained therein. Stated simply, the problem lies not with the VE's determination that the jobs of carton packer and 30 percent of the jobs of laundry worker require only an R–1 reasoning level, rather than the R–2 reasoning level as set forth in the DOT.[5] Instead, the problem lies with the fact that the VE testified, on the one hand, that a claimant with the limitations set forth by the ALJ, including a moderate limitation in concentration, could perform the jobs of carton worker and laundry worker, and then on the other hand, the VE testified that he would eliminate all jobs for a claimant with a moderate limitation in concentration (defined as unable to concentrate more than 50 percent of the time). Based on the apparent conflict in the VE's testimony, which renders it unreliable, the Court finds that the Commissioner failed to satisfy his burden of providing evidence of a significant number of jobs in the national economy that the claimant can perform.

### B. The Plaintiff's Mother's Testimony

■ The Plaintiff next objects to the Magistrate Judge's determination that the ALJ properly considered his mother's testimony, as previously ordered on remand. A review of the ALJ's decision indicates that the ALJ did not explicitly state that he considered the Plaintiff's mother's testimony in finding the Plaintiff moderately limited in social functioning, and in maintaining concentration, persistence, and pace; however, the Court agrees with the Magistrate Judge that it is apparent that the ALJ did, in fact, consider this testimony.

First, in his decision, the ALJ recounted the Plaintiff's mother's testimony about the Plaintiff's mental impairments and ultimately found that the Plaintiff has an antisocial personality resulting in moderate limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and attention for extended periods. Additionally, the ALJ found that the Plaintiff was limited to working in a relatively low-stress environment where he would not have to deal with the general public or relate extensively with others. With respect to the Plaintiff's mother's testimony regarding the Plaintiffs back pain, the ALJ found such testimony to not be fully credible based on a review of the medical evidence, which showed no back abnormalities. Based on the foregoing, the Court finds that the ALJ properly considered the Plaintiff's mother's testimony; nevertheless, because the Court is remanding this matter for further proceedings based on the VE's contradictory testimony (as set forth above), in the interest of clarity and fairness, the Court urges the ALJ to more specifically explain his consideration of the Plaintiff's mother's testimony on remand.

### C. Systematic Analysis

■ Lastly, the Plaintiff objects that the Magistrate Judge incorrectly dismissed the ALJ's failure to do a proper combination of impairments analysis. The Court disagrees with the Plaintiff and finds no error in the Magistrate Judge's determination that the ALJ properly considered the combined effects of the Plain-

---

5. Indeed, the *DOT* is not the only resource that an ALJ can use when determining whether work exists in the national economy that a claimant can perform; the ALJ can rely on VE testimony as long as a reasonable explanation exists to explain any conflict between the VE's testimony and the DOT. *See* 20 C.F.R. § 416.966(d)-(e) (2007); S.S.R. 00–4p.

tiff's impairments. As previously set forth, the ALJ limited the Plaintiff to medium work to account for his low-back pain. Additionally, the ALJ found that the Plaintiff's "flexion contracture problem" with his left ring finger reduced his grip strength in his left hand. To accommodate for the Plaintiff's borderline intelligence and antisocial personality traits, the ALJ limited the Plaintiff to low-stress work that a person with "moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods" could handle. Moreover, this work did not require contact with the general public or extensive contact with others. After a review of the record, the Court finds that the ALJ properly considered the combined effects of the Plaintiff's impairments.

### CONCLUSION

Based on the foregoing, the Court adopts the R & R only to the extent that it is consistent with this Order. Because the Court finds that the ALJ erred in his reliance on the VE's contradictory testimony, the Court remands the matter to the Commissioner for further proceedings. Upon remand, the Commissioner is specifically directed to obtain testimony to explain the apparent conflict in the VE's testimony regarding the Plaintiffs ability to perform work. Therefore, it is

**ORDERED** that the Commissioner's denial of benefits is reversed under sentence four of 42 U.S.C. § 405(g) and 1383(c)(3), and the matter is remanded to

the Commissioner for further consideration consistent with this Order.

**IT IS SO ORDERED.**

### ADDENDUM

Should this remand result in the award of benefits, plaintiffs attorney is hereby granted, pursuant to Rule 54(d)(2)(B), an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b), until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*[6]

### REPORT OF MAGISTRATE JUDGE

WILLIAM M. CATOE, United States Magistrate Judge.

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security terminating his eligibility for supplemental security income benefits under Title XVI of the Social Security Act.

### ADMINISTRATIVE PROCEEDINGS

The plaintiff, as a minor child, was awarded supplemental security income

---

**6.** This language was taken from *Stutts v. Astrue*, 489 F.Supp.2d 1291, 1295 (N.D.Ala. 2007).

**1.** A report and recommendation is being filed in this case, in which one or both parties declined 1 to consent to disposition by the magistrate judge.

(SSI) benefits commencing January 1, 1993, due to attention deficit hyperactivity disorder, based upon an application filed January 14, 1993. The plaintiff attained age 18 on June 19, 1997, and the claim was reevaluated, at which time it was determined that the plaintiff's condition had improved and that he no longer had marked and/or severe functional limitations. Disability was found to have ceased on August 1, 1997; therefore, the plaintiff's eligibility for SSI benefits terminated at the end of October 1997.

The plaintiff's mother requested reconsideration of the decision, which was denied on June 14, 1999. She then filed a timely request for a hearing. The hearing was held on February 10, 2000, attended by the plaintiff and his mother. Following the hearing, the administrative law judge (ALJ) found that the plaintiff was no longer under a disability, as he could perform medium work which did not involve continuous use of the left hand. The plaintiff requested review of the decision, and on December 6, 2001, the Appeals Council remanded the case to the ALJ for further consideration.

A supplemental hearing was held on March 13, 2002, at which the plaintiff, his attorney, his mother and a vocational expert appeared. On January 13, 2003, the ALJ again found that the plaintiff's disability had ceased on August 1, 1997. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 10, 2004. The plaintiff then sought judicial review.

On February 2, 2006, the Honorable Sol Blatt, Jr., Senior United States District Judge, adopted the recommendation of this court and remanded the case to the Commissioner for further proceedings. On January 24, 2007, a hearing was held at which the plaintiff, his attorney, his mother and a vocational expert appeared. On February 16, 2007, the ALJ once again found that the plaintiff was not under a disability. The ALJ's finding became the final decision of the Commissioner when it was subsequently approved by the Appeals Council.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1) The claimant has not engaged in substantial gainful activity since January 1, 1993, the alleged onset date (20 CFR 416.920(b) and 416.971 *et seq.*).

(2) The claimant has the following severe impairments: borderline intellectual functioning, antisocial traits, loss of grip strength in the left hand due to flexion contracture, and chronic back pain (20 CFR 416.920(c)).

(3) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

(4) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work. He can lift up to 50 pounds occasionally and 25 pounds frequently. He reads at the fourth grade level and is illiterate. He has a Verbal IQ of 73, a Performance IQ of 73, and a Full Scale IQ of 72. He is right-handed. He has a flexion contracture problem with his left ring finger and is moderately limited in his left hand grip (with grip strength 3/5 on the left). He has antisocial personality traits resulting in moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods. He is limited to

working in a relatively low stress setting where he would not have to deal with the general public or relate extensively with others.

(5) The claimant has no past relevant work (20 CFR 416.965).

(6) The claimant was born on June 19, 1979 and he is now 27 years of age, which is defined as a younger individual age 18044, on the date the application was filed (20 CFR 416.963).

(7) The claimant is illiterate and is able to communicate in English (20 CFR § 416.964).

(8) Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

(9) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

(10) The claimant has not been under a disability, as defined in the Social Security Act, since January 14, 1993, the date the application was field (20 CFR 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

### APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medi-

cally determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the

burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen,* 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972).

## EVIDENCE PRESENTED

The plaintiff was 27 years old on the date of the Commissioner's final decision (Tr. 65.) He completed the ninth grade in special education classes and has no past relevant work experience (Tr. 41–42).

The record reveals that on August 12, 1997, Cashton B. Spivey, Ph.D., evaluated the plaintiff at the request of the Commissioner. Dr. Spivey noted that the plaintiff had never been hospitalized for any physical or mental problem and had been taking Ritalin for ADHD, but that he had not taken Ritalin on the day of the evaluation. The plaintiff denied symptoms of depression or psychosis, reported normal sleep and energy level, and complained of problems with attention/concentration. He indicated he could read a newspaper and perform simple arithmetic calculations. Dr. Spivey found the plaintiff had borderline intellectual functioning with a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72. He noted that the plaintiff displayed no weakness in immediate visual memory, which he found to be inconsistent with ADHD. He found that the plaintiff read and performed arithmetic at a fifth-grade level. Dr. Spivey concluded that the plaintiff was developing antisocial personality traits, would continue to benefit from special education classes, and would hopefully be able to be a successful member of the work force in the future. Dr. Spivey also concluded that the plaintiff was better suited for manual labor than verbal or arithmetic tasks (Tr. 232–34).

On August 18, 1997, Dr. John Aycock examined the plaintiff at the request of the Commissioner. Dr. Aycock found the plaintiff had a flexion-tendon injury of the ring finger of the left hand, which could be surgically corrected, and no other physical abnormalities (Tr. 215–18).

On August 21, 1997, at the request of the Commissioner, Dr. Herbert Gorod

completed a Psychiatric Review Technique Form (PRTF) regarding the plaintiff based on a review of the plaintiff's records. Dr. Gorod reported that the plaintiff's borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living, social functioning, and concentration, and had "once or twice" resulted in episodes of decompensation in work-like settings (Tr. 219–27). In an accompanying mental residual functional capacity assessment, Dr. Gorod reported that the plaintiff had no significant limitations in most areas of work-related mental functioning, and "moderate" limitations in understanding, remembering, and carrying out detailed instructions, and accepting instructions and responding appropriately to criticism from supervisors (Tr. 228–30).

On February 25, 1999, Dr. James W. Folk, Jr., examined the plaintiff at the request of the Commissioner. The plaintiff complained of back pain resulting from an injury sustained in September 1998, when he was struck by a truck, and an inability to extend his left ring finger. He denied a history of psychiatric treatment, and, except for Motrin and occasional doses of Ritalin to help him calm down, he denied taking medication. He stated that he spent his time exercising, walking around, and playing basketball, and that he did some household chores and yard work. He reported that he had recently completed a GED program but had not yet taken the test due to lack of funds. The plaintiff's mother indicated that the plaintiff "[ran] with a bad crowd," engaged in various antisocial behaviors, and had diffi-

culty with various tasks due to a failure to pay attention (Tr. 261–62).

Dr. Folk found the plaintiff had fair memory and limited general information; below-average counting, calculating and digit-recall abilities; absent insight; moderately-impaired judgment; and low-average intellectual functioning. He found the plaintiff capable of interacting socially, concentrating and understanding and responding appropriately, and he noted that the plaintiff denied many of the behaviors described by his mother. Dr. Folk reported diagnoses of ADHD (by history), antisocial personality traits, and a GAF of 65.[2] Dr. Folk stated that although the plaintiff had a history of ADHD, "presently the concern would be more his personality deficits and the need for some structure in his life." Dr. Folk concluded that the plaintiff "would be quite capable of doing some type of manual labor," and recommended referral to the Department of Vocational Rehabilitation (Tr. 263–64).

On March 16, 1999, at the request of the Commissioner, Lisa Smith–Klohn, Ph.D., completed a PRTF regarding the plaintiff based on a review of his records. Dr. Smith–Klohn reported that the plaintiff's ADHD, borderline intellectual functioning and antisocial personality disorder caused "moderate" limitations in activities of daily living and social functioning, "often" caused deficiencies of concentration and "never" resulted in episodes of deterioration or decompensation in work-like settings (Tr. 269–77). In an accompanying mental residual functional capacity assessment, Dr. Smith–Klohn reported that the plaintiff had no significant limitations in most areas of work-related mental func-

---

**2.** A Global Assessment of Functioning (GAF) code between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the house-

hold), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 32 (4th ed.1994).

tioning and moderate limitations in understanding, remembering and carrying out detailed instructions, and in maintaining concentration and attention for extended periods (Tr. 265–67).

On April 29, 1999, at the request of the Commissioner, Dr. Richard Weymuth assessed the plaintiff's physical residual functional capacity based on a review of the plaintiff's records. Dr. Weymuth concluded that the plaintiff did not have a "severe"[3] physical impairment (Tr. 279–87).

On December 20, 1999, an orthopedist at the Medical University of South Carolina found the plaintiff had decreased grip strength in the left hand and problems with flexion and contraction in the fingers of the left hand, particularly the ring finger, due to a previous injury (Tr. 254).

On March 14, 2000, Dr. Craig Harris examined the plaintiff in relation to complaints of injuries sustained in a motor vehicle accident on week earlier. The plaintiff complained of headaches, dizziness, insomnia, neck pain, upper back pain, midback pain, low-back pain, and left hand and wrist pain. Dr. Harris found the plaintiff had normal strength in the upper and lower extremities, decreased range of motion of the lumbar spine, muscle spasms in the cervical region and decreased grip strength in the left hand. He noted an assessment of cervicogenic cephalgia, cervical strain/sprain, thoracic strain/sprain, lumbar strain/sprain, and exacerbation of preexisting hand injury. Dr. Harris recommended medication for inflammation and pain (Tr. 342–44).

The plaintiff returned to Dr. Harris on an unspecified date, complaining of severe low-back and left-hand pain. His neurological examination was unremarkable. Dr. Harris recommended continued conservative treatment and an MRI scan (Tr. 344–45).

On October 14, 2001, the plaintiff presented at Care Alliance Health Services with complaints of headaches and of pain in the right knee and mid-back following a motor vehicle accident. An impression of contusion of the right knee and back strain was rendered (Tr. 348–54).

On January 10, 2002, the plaintiff returned to Care Alliance Health Services complaining of back pain since October 2001. The plaintiff related that he had taken no medication to attempt to relieve his pain, and his examination was unremarkable. He was diagnosed with chronic low-back pain (Tr. 357–63).

In June 2002, the plaintiff sought emergency room treatment for complaints of low-back pain. Examination revealed decreased range of motion and muscle spasms in the lower back. Anaprox and Norflex were prescribed for chronic low-back pain (Tr. 497–502).

In October 2004, the plaintiff sought emergency room treatment for complaints of dizziness, headache and nausea. A CT scan of his head was normal. Compazine was administered and a diagnosis of acute cephalgia was noted (Tr. 468–75).

In November 2005, the plaintiff sought emergency room treatment for complaints of head and back pain after a fall. On admission, "Jim Grant Carpeting" was identified as his employer. A CT scan of the plaintiff's head was normal, and x-rays of his back showed a mild compression deformity at T7–8. Percocet was prescribed (Tr. 454–66).

In March 2006, the plaintiff sought emergency room treatment for complaints

---

**3.** An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.921(a) (2007).

of intermittent headaches after he fell and hit his head several months before. On admission "Jim Grant Carpeting" was identified as the plaintiff's employer. Examination was unremarkable except for elevated blood pressure, and a CT scan of his brain was normal. He was diagnosed with chronic headache and hypertension. Lortab and anti hypertensive medication were prescribed (Tr. 445–53).

At the hearing on February 10, 2000, the plaintiff testified that he left school in the tenth grade (Tr. 27.) He testified that he attempted to work as a dishwasher in a pizza shop and that the job ended after one day because his hand hurt (Tr. 28). He testified that his left hand was weak and that it sometimes started "jumping" for no apparent reason (Tr. 30). He testified that he experienced pain in his right leg when walking (Tr. 31). He testified that he could read "a little bit" and could write (Tr. 29).

At the hearing on March 13, 2002, the plaintiff testified that he had enrolled in a GED class but never completed it (Tr. 42–43). He testified that he was unable to grip anything with his left hand and that he experienced intermittent back pain, mostly at night (Tr. 43). He testified that he did "not really" know how to read (Tr. 44–45).

Hermina Woodley, the plaintiff's mother, testified that the plaintiff did not complete household chores he started, could not understand instructions and could not successfully buy items on a shopping list (Tr. 47–49). She testified that his only activities were watching television and listening to the radio (Tr. 47–48). She testified that he was impatient and quick to become angry (Tr. 50–52). She testified that he no longer took Ritalin and that aspirin was his only medication (Tr. 52).

The ALJ asked Mark Meadows, Ed.D., a vocational expert, to consider a person of the plaintiff's age and educational background who read at a fourth-grade level, was illiterate "in terms of Social Security rules," could perform "medium work," and had a full scale IQ of 72, a flexion-contraction problem with his left ring finger, and moderately limited grip strength in his left hand (Tr. 53–54). Dr. Meadows testified that such a person could work as a flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper (Tr. 55–56). He also testified that if the same individual were restricted to low-stress work, he could perform those jobs (Tr. 57–58).

At the hearing on January 24, 2007, the plaintiff did not testify (Tr. 503–22). Ms. Woodley testified that the plaintiff's back bothered him all the time since he was hit by a truck in 2002, and that he had headaches associated with high blood pressure, for which he took medication (Tr. 507). She testified that he continued to have problems controlling his anger and was forgetful, but that his control of his anger had improved (Tr. 508–09). She testified that he could not finish tasks without being reminded (Tr. 509–10). She testified that the plaintiff pushed her around in her wheelchair, gave her medications, watched television, spent time with her granddaughter, and did housework if he was constantly told what to do (Tr. 510–12). She testified that the plaintiff's current main problem was back pain (Tr. 513).

At this hearing, the ALJ asked Arthur F. Schmitt, Ph.D., a vocational expert, to consider a person with the following limitations:

> Assume I find the claimant is 27–years of age and has an 8th grade education in special education and is illiterate by Social Security standards. Assume further for the moment that on an exertional level he could perform no greater than medium work activity and that he has the following nonexertional limita-

tions. He's, he reads at the 4th grade level and is illiterate by our standards, he has a verbal IQ of 73, a performance IQ of 73, and a full scale IQ of 72. He's right-handed, he has a flexion contracture problem with his left wring finger and is moderately limited in his left hand grip.. The grip strength in his left hand is three out of five. In addition he has a antisocial personality resulting in moderate limitations in understanding, remembering and carrying out detailed instructions and in maintaining concentration and ... attention ... for extended periods. He's limited to working at a relatively low-stress setting where he wouldn't have to deal with the general public or relate extensively with others ...

(Tr. 513–14). Dr. Schmitt testified that such a person could perform unskilled medium work as a laundry worker, and unskilled light work as a carton packer (Tr. 514–15). He testified that a person with the limitations stated in the ALJ's hypothetical would be limited to jobs requiring level-one reasoning, and that the jobs of laundry worker and carton packer were described in the *DOT* as requiring level-two reasoning (Tr. 515–21). Dr. Schmitt acknowledged that a conflict existed between his testimony and those jobs with regard to reasoning-level requirements, but that based on his experience, all carton packer jobs and 30 percent of laundry worker jobs required only level-one reasoning (Tr. 518–22).

### ANALYSIS

As noted above, on February 2, 2006, the Honorable Sol Blatt, Jr., Senior United States District Judge, adopted the recommendation of this court and remanded the case to the Commissioner for further proceedings. Upon remand, the ALJ was directed to conduct a supplemental hearing and: (1) include in the hypothetical to the vocational expert the plaintiff's antisocial personality traits and his moderate limitations in understanding, remembering, and carrying out detailed instructions and in maintaining concentration and attention for extended periods; (2) obtain testimony from a vocational expert to explain why the plaintiff would be able to perform the positions listed by the vocational expert in the 2002 hearing, which required a reasoning level of R–2 or above, when the ALJ had found that the plaintiff was illiterate and capable of only one- and two-step processes, which under the criteria of the *DOT* constitutes an R–1 reasoning level; and (3) consider and expressly evaluate the testimony of the plaintiff's mother and set forth the reasons for not crediting her testimony. On January 24, 2007, a hearing was held at which the plaintiff, his attorney, his mother, and a vocational expert appeared. On February 16, 2007, the ALJ once again found that the plaintiff was not under a disability.

The plaintiff argues that the ALJ erred by (1) failing to obtain vocational expert testimony as ordered by remand; (2) failing to properly evaluate and consider lay testimony as ordered by remand; and (3) failing to consider whether his combined impairments were of equal medical significance to a listed impairment.

### *Vocational Expert Testimony*

In the report and recommendation adopted by Judge Blatt, this court explained that the plaintiff's mental limitations were consistent with the *DOT*'s criteria for level-one reasoning ("R1"), that the jobs the vocational expert identified at the March 2002 hearing (flag man/signaler, inspector/grader/sorter, and cleaner/housekeeper) required level-two reasoning ("R2") or higher, and that the ALJ erred by failing to resolve this apparent conflict

between the vocational expert's testimony and the *DOT* (Tr. 429–30).

An ALJ is not restricted to the *DOT* in determining whether work exists in the national economy that a claimant can perform; the ALJ may also rely on vocational-expert testimony to make that determination. *See* 20 C.F.R. § 416.966(d), (e) (2007).

In his initial brief, the plaintiff argued that the ALJ failed to obtain testimony to explain the conflict between the vocational expert's testimony and the *DOT* as required in the remand order. In his reply brief, the plaintiff conceded that the ALJ did obtain the required testimony. However, the plaintiff argues that the vocational expert testimony obtained by the ALJ shows that he is indeed disabled. As this issue was not raised in the plaintiff's initial brief, the defendant was given an opportunity to respond, which he did on March 20, 2008.

In his hypothetical to the vocational expert in the latest hearing, the ALJ included the following limitation: "Antisocial personality resulting in moderate limitations in understanding, remembering, and carrying out detailed instructions, and in maintaining concentration for extended periods" (Tr. 513–14). In response to the hypothetical, the vocational expert identified the jobs of laundry worker and carton packer as jobs such a person could perform (Tr. 514–15). The plaintiff's attorney asked the expert to define "moderate limitation," since the plaintiff had a "moderation limitation in understanding, remembering, and carrying out detailed instructions" (Tr. 517). The vocational expert testified that a "moderate" impairment was one that was present more than 50% of the time (Tr. 517). The attorney then asked whether a person who was unable to concentrate, remember and carry out instructions for more than 50% of

the time could do the work identified by the vocational expert (laundry worker and carton packer) (Tr. 518). In response, the vocational expert testified: "[I]f he cannot concentrate ... more than 50 percent, moderate limitation, I would eliminate the job." The attorney then asked, "Would that eliminate pretty much all jobs?," to which the vocational expert replied, "Yeah" (Tr. 518).

The defendant argues that this apparent inconsistency in the vocational expert's testimony was clarified in the vocational expert's later testimony under questioning by the ALJ. The vocational expert testified that the ALJ's hypothetical described an individual with level-one reasoning skills, and that the jobs he identified in response to the hypothetical were described in the *DOT* as requiring level-two reasoning (Tr. 520). The ALJ asked the vocational expert to explain this conflict between his testimony and the *DOT* (Tr. 520). In response, the vocational expert testified that, based on his personal observations, the job of carton packer and 30 percent of laundry-worker jobs required only R1 reasoning ability (Tr. 520–22). After the plaintiff's counsel finished questioning the vocational expert, the ALJ asked the expert to consider the "original limitations I gave you," including moderate limitations in maintaining concentration and attention (Tr. 521). The vocational expert testified that a person with moderate limitations in maintaining concentration and attention and with the plaintiff's other limitations could perform the job of carton packager without a reduction in the number of jobs and could perform the job of laundry worker with a 70% reduction in the number of jobs (Tr. 521–22). Earlier, the vocational expert had testified that 235,708 laundry worker jobs and 275,000 carton packer jobs existed in the national economy (Tr. 514–15).

Thus, even with a 70% reduction in the number of laundry-worker jobs, the vocational expert indicated that the plaintiff could perform 345,712 jobs (70,712 laundry worker jobs plus 275,000 carton packager jobs) in the national economy. Therefore, the defendant contends that the vocational expert provided evidence of a significant number of jobs that the plaintiff could perform. *See Martinez v. Heckler*, 807 F.2d 771 (9th Cir.1986) (finding 3,750 to 4,250 jobs a significant number); *Allen v. Bowen*, 816 F.2d 600 (11th Cir.1987) (finding 80,000 in the nation a significant number); *Barker v. Sec'y of Health & Human Servs.*, 882 F.2d 1474 (9th Cir.1989) (finding 1,900 jobs a significant number).

The vocational expert's testimony at the January 2007 hearing was, as conceded by the defendant, quite confusing. However, the vocational expert clarified his testimony and stated that based upon his own observations the jobs of carton packer and 30 percent of laundry-worker jobs required only R1 reasoning ability, and he further testified that a person with moderate limitations in maintaining concentration and attention, like the plaintiff, could perform those jobs (Tr. 521). Considering the entire record, this court finds that the Commissioner has met the burden of showing that the plaintiff can perform alternative work and that such work exists in the national economy.

### Witness Testimony

The plaintiff next argues that the ALJ failed to properly evaluate and consider the testimony of the plaintiff's mother. Specifically, the plaintiff complains that the ALJ addressed only the witness' testimony regarding the plaintiff's physical impairments and ignored her testimony as to the plaintiff's mental impairments, including a longstanding history of violent and impulsive behavior and difficulty under-standing instructions and paying attention (Tr. 508–10).

Upon remand, the ALJ was instructed to "consider and expressly evaluate the testimony of the plaintiff's witness, his mother, and set forth the reasons for not crediting her testimony." At the hearing on January 24, 2007, the plaintiff's attorney asked the plaintiff's mother whether the plaintiff still had difficulty in controlling his anger. She replied that it was not as bad as it used to be (Tr. 508). The plaintiff's mother testified that the plaintiff was about the same as he had been in 2002 with regard to his memory, paying attention, understanding instructions, and controlling impulses (Tr. 509–10). The plaintiff's mother testified that she had to constantly tell the plaintiff what to do (Tr. 510).

In his decision, the ALJ recounted this testimony about the plaintiff's mental impairments, as well as the testimony of the plaintiff's mother from the 2002 hearing (Tr. 388–89). Later in the decision, he recounted the plaintiff's testimony and his mother's testimony as to his back pain. He then cited medical evidence showing that the plaintiff had no significant back abnormalities and stated: "For the reasons stated, I do not find his testimony and the testimony of the claimant's mother fully credible" (Tr. 390).

The ALJ found that the plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and in concentration, persistence, and pace (Tr. 387). In making these findings, the ALJ stated: "The claimant's mother testified that the claimant does some housework, helps her with medications and pushes her around, likes to visit his aunt, and he watches television. After considering his daily activities, I find that he has only a mild limitation in daily activities" (Tr. 387). With regard to his

finding about social functioning, the ALJ noted that there was evidence that the plaintiff exhibited antisocial traits, and therefore he found the plaintiff moderately limited in that area (Tr. 387). As to concentration, persistence, and pace, the ALJ noted the plaintiff's IQ scores were in the 70s but that Dr. Spivey had reported the plaintiff was capable of successfully joining the workforce. Accordingly, he found the plaintiff moderately limited in that area (Tr. 387). Although the ALJ did not state whether he considered the plaintiff's mother's testimony in making these findings, it appears to this court that her testimony as to the plaintiff's social functioning and concentration actually supports these findings.

### Combined Impairments

■ Lastly, the plaintiff argues that the ALJ failed to consider whether his combined impairments were of equal medical significance to a listed impairment. In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.' " *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir.1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir.1983).

The defendant first argues that the plaintiff has not met his burden of proving that his impairments meet or equal a listing. The plaintiff has failed to explain how his condition satisfies the criteria of a specific listing, and he has failed to identify any listing his conditions might equal. Furthermore, the defendant argues that the ALJ considered the effects of all of the plaintiff's impairments in determining his residual functional capacity. The ALJ accounted for the plaintiff's low-back pain by limiting him to medium work (Tr. 387). He found the plaintiff's "flexion contracture problem" with his left ring finger reduced his grip strength in the left hand (Tr. 387). He accommodated the plaintiff's borderline intelligence and antisocial personality traits by limiting him to low-stress work that did not require contact with the general public or extensive contact with others, and that a person with moderate limitations in maintaining concentration and attention and moderate limitations in understanding, remembering and carrying out detailed instructions could perform (Tr. 387). This court has reviewed the record and finds that the ALJ properly considered the combined effect of the plaintiff's impairments.

### CONCLUSION AND RECOMMENDATION

This court has considered the entire record and finds that the ALJ's decision that the plaintiff is not disabled is based upon substantial evidence. Based upon the foregoing, this court recommends the decision of the Commissioner be affirmed.

April 2, 2008.